# <u>IN THE MATTER OF:</u>

## *WILLIAM R. CARROLL, et al.*

### *-v-*

## *BENJAMIN J. MARTIN, et al.*

---

### *BRENT KEENER*
### *FEBRUARY 5, 2003*

---

*Walls Reporting, Inc.*
*Professional Court Reporters*
*Maryland, D.C., & Northern Virginia*
*(410) 647-6434*

*Condensed Transcript with Word Index*

1              IN THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MARYLAND

2                    (Northern Division)

3    WILLIAM R. CARROLL,        *

     et al.                     *

4                               *

            Plaintiffs          *

5                               *      Civil Action

         v.                     *

6                               *      No. MJG-02-CV-2084

     BENJAMIN J. MARTIN,        *

7    et al.                     *

                                *

8            Defendants         *

               * * * * * * * * *

9

10

11              Pursuant to Notice, the deposition of

12   BRENT KEENER was taken on Wednesday, February 5th,

13   2003, commencing at 10:02 a.m., at the law offices

14   of Schlachman, Belsky & Weiner, P.A., 20 South

15   Charles Street, Tenth Floor, Baltimore, Maryland

16   21201, before Sharon A. Beaty, Notary Public.

17

18

19

20

21   Reported by:  Sharon A. Beaty, CSR

ca59d640-457e-11d7-b01c-00c0dfa55125

Page 2

```
1    APPEARANCES:
2         ON BEHALF OF THE PLAINTIFFS:
3         Henry L. Belsky, Esquire
          Schlachman, Belsky & Weiner, P.A.
4         20 South Charles Street - Tenth Floor
          Baltimore, MD 21201
5         Telephone: 410-685-2022
          Fax: 410-783-4771
6
7         ON BEHALF OF THE DEFENDANTS:
8         Michael B. Mann, Esquire
          409 Washington Avenue, Suite 600
9         Towson, MD 21204
          Telephone: 410-296-6826
10        Fax: 410-825-1805
11
12
13
14
15
16
17
18
19
20
21
```

Page 4

```
1              INDEX          PAGE
2    EXHIBITS, continued:
3    14 Pennsylvania Department of              51
        Transportation Bureau of Driver
4       Licensing Three Year Driving
        Record January 25, 2001
5
6    15 Photocopy of driver's license,          56
        Social Security card and Medical
7       Examiner's Certificate
8
9    16 New Cell Phone Policy                   59
10
11
12
13
14
15
16
17
18
19
20
21
```

Page 3

```
1               INDEX          PAGE
2    WITNESS:
3       Brent Keener
4    EXAMINATION:
5       By Mr. Belsky         5
6    EXHIBITS: (Attached)
7       1 Notice to Take Deposition        5
8       2 Employer Questionnaire           5
9       3 Personnel Action Form            5
10      4 Photocopy of photographs         5
11      5 Driver's Accident Report Form      15
12      6 Verizon Wireless log of calls    20
13      7 Verizon Wireless Cellular Charges &   24
          Credits for 717-917-2466
14
        8 Verizon Wireless log of calls    26
15
        9 Photographs                      35
16
        10 Document entitled Kline Appraisal   36
17      Service
18      11 Application for Employment       44
19      12 Driver Application for Employment    45
20      13 Request for Information from      49
          Previous Employer
21
```

Page 5

```
1                 STIPULATIONS
2         It is stipulated and agreed by and
3    between counsel for the respective parties that the
4    reading and signing of this deposition by the
5    witness be and the same are hereby waived.
6         It is further stipulated and agreed
7    that the filing of this deposition with the Clerk
8    of the Court be and the same is hereby waived.
9                 *********
10        (Exhibits 1 through 4 premarked.)
11            BRENT KEENER,
12   called for examination, having been duly sworn to
13   tell the truth, the whole truth and nothing but the
14   truth, testified as follows:
15        EXAMINATION BY MR. BELSKY:
16      Q   I'm sure that your -- well, my name is
17   Henry Belsky, as you know, and I'm sure your
18   attorney has already explained everything about a
19   deposition. Have you ever had your deposition
20   taken before?
21      A   Yeah.
```

                                                    2 (Pages 2 to 5)

Page 6

1   Q   On how many occasions?
2   **A   Just once.**
3   Q   Was that relative to an accident too?
4   **A   No.**
5   Q   What type of matter was that in?
6   **A   That was in regards to a workers' comp**
7   **claim.**
8   Q   And where was that taken at?
9   **A   It was in Lancaster.**
10  Q   Was it just before the commission or was
11  it in court?
12  **A   It wasn't in the court, it was in a**
13  **setting like this.**
14  Q   Okay. If I ask you any questions you
15  don't understand, just please tell me to rephrase
16  it, and if you give me an answer I'll assume we're
17  communicating. If you want to take a break, that's
18  fine, I don't think we're going to be very long.
19  **A   Okay.**
20  Q   But if you need anything, I don't have a
21  problem stopping. You have to answer with words,

Page 7

1   not nods of heads.
2   **A   Okay.**
3   Q   And that way she can take it down. And
4   please wait until whoever is asking a question to
5   finish their question so that she can take down the
6   question and answer. Sometimes as we talk in
7   normal language we override each other. That
8   doesn't do her any good.
9       Now, having said that, I'm going to show
10  you what I previously marked as Exhibit 1, which is
11  a notice of deposition.
12  **A   Okay.**
13  Q   And I understand from counsel that the
14  only additional records that you brought with you
15  today were the telephone records on the date of the
16  accident; is that correct?
17  **A   Uh-huh. Yes.**
18  Q   Is it your testimony that we have
19  already been supplied with all the -- have you ever
20  seen that before?
21  **A   Yes, yes.**

Page 8

1   Q   Is it your testimony that we've already
2   been supplied with all the other information in the
3   other discovery requests or court submissions?
4   **A   As far as I know.**
5   Q   Okay. I'm going to start off probably
6   right at the get go. Can you identify this
7   document? And I've marked it as Exhibit 2. It's
8   the employer questionnaire.
9   **A   Yeah, this is a, this is a document**
10  **that's used for unemployment compensation.**
11  Q   That's not a history of the termination
12  of the employee?
13  **A   It's a document that's presented for the**
14  **Lancaster County unemployment compensation to**
15  **determine whether or not an employee is eligible**
16  **for unemployment.**
17  Q   And who fills that out?
18  **A   This was filled out by my assistant, Jan**
19  **Wenger.**
20  Q   And does the employee sign that?
21  **A   No.**

Page 9

1   Q   On question number 5 it says please
2   indicate the reason the claimant, which in this
3   case was Ben Martin, was separated on the reverse
4   side of the form or on a separate sheet of paper
5   and return it with this form to the office named
6   above. A statement describing the final incident
7   which caused the claimant to be separated should be
8   provided and signed by an individual with firsthand
9   information concerning the incident. Is there
10  another document, because I don't know who would
11  have firsthand knowledge of the incident other
12  than -- well, who is the person that performed that
13  function?
14  **A   That performed what function?**
15  Q   Who provided the written statement who
16  had firsthand knowledge?
17  **A   This statement?**
18  Q   Well, I don't know what statement that's
19  referring to, it's not my form, so if that's the
20  statement then --
21  **A   I wrote down the information on the**

WALLS REPORTING, INC.
MARYLAND, D.C., & NORTHERN VIRGINIA - 410-647-6434

ca59d6d-457e-11d7-b01c-00c0dfa55125

Page 10

1  additional information.
2     Q   So you had firsthand knowledge on the
3  incidents that came to his termination?
4     A   That's correct.
5     Q   Now, it indicated in there, if I
6  remember correctly, that there was a prior accident
7  to this incident?
8     A   Yes, that's correct.
9     Q   Is that included in his personnel file?
10  I didn't see that.
11    A   It would be in the driver file.
12    Q   Again, I may have gotten it and I don't
13  recognize what it is.
14       MR. MANN:  Let me see if we can find it
15  for you.
16       MR. BELSKY:  I appreciate it.
17    Q   While he's looking for that I'll ask you
18  if you can identify this document because I don't
19  know what this is either?
20    A   This is a personnel action form, it's a
21  form used by our company to determine different

Page 11

1  personnel action that's taken.
2     Q   What action is that?
3     A   On this it was a termination discharge
4  for Ben Martin.
5     Q   Just so the record is clear that's what
6  I previously marked as Exhibit 3?
7     A   (Nodding head indicating yes.)
8     Q   And what was the reason for his
9  termination?
10    A   The reason was because he had two
11  incidences, two vehicular incidences within his
12  first, it was about three and a half months
13  employment.
14    Q   When you say incidences you mean two
15  accidents in the first three months?
16    A   Correct.
17    Q   Do you remember the -- well, I'll wait
18  for your counsel to see if he can find them.
19       MR. MANN:  Where it's going to be is in
20  that one thing that we were looking at, you know,
21  the evaluation, the three month evaluation.  I'm

Page 12

1  not sure, maybe you can --
2       THE WITNESS:  Well, yeah.
3       (Pause in the proceedings.)
4     Q   I forgot to ask you a preliminary
5  question.  Why don't you state your name for the
6  record.
7     A   Okay.  My name is Brent Keener.
8     Q   Keener?
9     A   Keener.
10    Q   Mr. Keener, what is your affiliation
11  with the defendant in this case, LamTech?
12    A   Yeah, I'm the vice president of human
13  resources and safety.
14    Q   And how long have you been vice
15  president of human resources and safety?
16    A   I have been vice president for about two
17  years, been with the organization for a little over
18  eight years.
19    Q   Can you describe your job function?
20    A   Yeah, I'm in charge of the human
21  resources department and oversee the safety

Page 13

1  administration as well.
2     Q   And you have had that position for two
3  years?
4     A   Right.
5     Q   On the date of this accident what was
6  your position with the company?
7     A   I was also, at that time I was human
8  resources manager and vice president of
9  distribution.
10    Q   So you were not safety --
11    A   I was in charge of safety as well.
12    Q   Okay.  And how long have you held that
13  position?
14    A   I had been human resources manager ever
15  since, for that eight years and had the
16  distribution, vice president of distribution, I had
17  just recently had that for about, about a month
18  perhaps prior to the incident.
19    Q   And LamTech is what type of corporation;
20  is it a public corporation, a private corporation?
21    A   Privately held.

4 (Pages 10 to 13)

ca59d640-457a-11d7-b01c-00c0dfa55125

Page 14

1   Q   Do you have any equity position in the
2   company?
3   A   No.
4   Q   Who has the equity positions in the
5   company?
6   A   Ray Martin is our CEO, he is an owner,
7   and then there are three other owners as well with
8   minority --
9   Q   So Ray Martin is the majority owner?
10  A   Yes.
11  Q   Is he active in the business?
12  A   Yes.
13  Q   And what is his title?
14  A   CEO.
15      MR. MANN: Okay. I'll show you this
16  form. I don't think that was actually part of the
17  file. That's for the prior. We disclosed that in
18  the Answers to Interrogatories that I told you we
19  had.
20      MR. BELSKY: I'll have this marked.
21      MR. MANN: Yeah, okay.

Page 15

1       MR. BELSKY: So I have it, but I already
2   had some documents marked so I'll take it out of
3   order. We'll ask that the driver's accident report
4   of the accident of 11-30-00 be marked as Deposition
5   Exhibit 5.
6       (Exhibits 5 marked.)
7   Q   Now, can you just take me step by step
8   the actions that was taken by the company to
9   terminate this driver?
10  A   Yeah, there was, he had had the first
11  incident about a month or two months after he had
12  been hired where he hit a tree, a tree limb. We
13  deliver, we drive box trucks, we deliver in
14  residential areas, oftentimes townships and
15  municipalities don't trim the trees back as often
16  as well as they maybe should, and so we were
17  willing to overlook that. When he had the second
18  incident and there was some question as to his
19  fault, we made the determination at that point that
20  we did not want him driving trucks anymore. So we
21  began looking around to see if there were other

Page 16

1   positions in the organization where he could, that
2   he could do and we weren't able to come up with any
3   and so his employment was then subsequently
4   terminated.
5   Q   Okay. Well, did you make a
6   determination of fault?
7   A   No.
8   Q   Did you ask him how the accident
9   happened?
10  A   Yes.
11  Q   And did he give you a written report?
12  A   No.
13  Q   What did he tell you how the accident
14  happened?
15      MR. MANN: Objection. I'm going to
16  instruct him not to answer that.
17      MR. BELSKY: And why?
18      MR. MANN: It's a conversation that
19  Mr. Keener had with Mr. Martin and it was for the
20  purposes of this claim, this insurance claim and
21  it's work product discussion between two parties.

Page 17

1   Q   When did you first consult an attorney
2   in this case?
3   A   It wasn't until we found out about the
4   lawsuit.
5   Q   When did you first notify your carrier?
6   A   The day of the incident.
7   Q   Was it before or after you talked to
8   Mr. Martin?
9   A   I believe it was after.
10  Q   So you spoke to him, Mr. Martin first,
11  then you notified your carrier?
12  A   Yes.
13      MR. BELSKY: I don't see how you can --
14      MR. MANN: Ask him what the purpose of
15  speaking to him was.
16  Q   What was the purpose of speaking to him?
17  A   To determine how to file a claim or what
18  to say to the insurance carrier.
19  Q   Okay. And was it also the purpose to
20  find out whether he should be terminated?
21  A   No.

5 (Pages 14 to 17)

ca59d640-457e-11d7-b01c-00c0dfa55125

Page 18

1      MR. BELSKY: I still don't see that it's
2  privileged.
3      MR. MANN: I do.
4      MR. BELSKY: Okay. I guess we'll deal
5  with that later.
6      Q   Who was present on that conversation?
7      A   Just myself. I talked to him over the
8  phone.
9      Q   And was that a cell phone?
10     A   He was using his cell phone I believe.
11     Q   And did he call you from the scene?
12     A   I believe he had called in earlier and,
13  but it was before I got to work and then I found
14  out about it and I called in, called him.
15     Q   This document, which I think you
16  produced today, is the cell phone for that day? I
17  haven't had a chance to look at it, I just got it.
18     A   Yes.
19     Q   Can you point out the two telephone
20  conversations you're talking about?
21     A   Yeah, I believe he called in, the date

Page 19

1  of the incident was the 16th, at about ten of 7 he
2  called in I believe to report the incident, I'm not
3  exactly sure when I called him, it would have, it
4  would have probably been an incoming call for him.
5  I believe I called him on his cell phone probably
6  around ten of 9 or --
7      Q   I'm sorry. Would you mark the one where
8  he called his office?
9      A   Where he called the office?
10     Q   Right. And is there an incoming that
11  you would make your best estimate as to when that
12  would be, would you mark that one?
13     A   That I would have called him. Yeah. It
14  would have been one of these two, I'll just put
15  that one.
16     Q   Now, I assume your number of your
17  company is 738-3044?
18     A   That's correct.
19     Q   Area code 717?
20     A   Uh-huh.
21     Q   And the numbers that are on the

Page 20

1  incoming, 13 and 14 that's marked on here
2  numerically is 917-2466 and 355-224 -- 89. Are you
3  familiar with those numbers?
4      A   The 2466 I believe is his number, 917.
5      Q   And the 2289?
6      A   That one I'm not certain who that is.
7      Q   This document that we're going to have
8  marked as Exhibit 6, are these all his calls?
9      A   Those are all the calls for his phone,
10  yes.
11     MR. BELSKY: I'll have that marked as
12  Exhibit 6.
13     (Exhibit 6 marked.)
14     A   Those are just prior months.
15     Q   Okay. Based on your conversation with
16  him did he continue to deliver the load?
17     A   I don't recall. I don't believe he did.
18  I think he was too shooken up and so I believe we
19  sent another driver down.
20     Q   Okay. Did you have a chance to meet
21  with him after the accident?

Page 21

1      A   I'm trying to remember. I don't believe
2  I did. The next time that I met with him I believe
3  was for his termination.
4      Q   And when would that have been?
5      A   On the 19th.
6      Q   And at the termination is there a
7  hearing on that?
8      A   No, it was just myself and his
9  supervisor, Bob Brooks, and him in my office.
10     Q   Was the decision already made or was
11  it --
12     A   At that point the decision had already
13  been made.
14     Q   And is there a policy at the company
15  about him having a right of appeal from
16  termination?
17     A   There's no official policy about an
18  appeal.
19     Q   And what is the unofficial policy?
20     A   Once you're terminated, you're
21  terminated.

WALLS REPORTING, INC.
MARYLAND, D.C., & NORTHERN VIRGINIA - 410-647-6434

ca59d640-457e-11d7-b01c-00c0dfa55125

Page 22

1    Q    Okay. Could you just give me the
2    essence of the conversation between you and him at
3    that meeting?
4    A    Sure.
5    Q    Or, and the other gentleman.
6    A    Sure. I basically told him that, you
7    know, we had had two incidences within, you know,
8    the first couple months, I told him that we had
9    looked around for another position in the company
10   and that we didn't have any available that we
11   thought would suit him and so that we were going to
12   have to terminate his employment. He said, you
13   know, that's fine, he wasn't angry or wasn't upset,
14   he said he understood, and we shook hands and
15   parted ways.
16   Q    You were aware that in 1998 he had his
17   license suspended?
18   A    Yes.
19   Q    That was part of his employment
20   application?
21   A    Right.

Page 23

1    Q    And you were aware that he had a prior
2    accident before coming to your employment?
3    A    Correct.
4    Q    Why don't you take me through -- and
5    you're aware that he had a raise in January of the
6    year of the accident, is that right, a 25 cent
7    raise?
8    A    Oh, an increase, yes.
9    Q    First of all, what is the basis of
10   giving him an increase? I looked at his
11   performance, they looked like they were all not
12   excellent but superior, or whatever the category is
13   below that. How do you determine the raise?
14   A    Well, it's determined by a supervisor
15   who felt he was doing an adequate job, he had had
16   the one incident but he also had a valid CDL class
17   A license. Our trucks don't require a class A
18   license and so we started him out at a base rate
19   and felt that after three months that he would be
20   deserving of an increase.
21        MR. MANN: Could I interrupt just for

Page 24

1    one second? You marked as number 5 the cell phone
2    record?
3        MR. BELSKY: I think number 6.
4        MR. MANN: Or number 6, I'm sorry. I
5    just want to let you know that's an original too so
6    we just need to make a copy. I'll keep that. And
7    the other one, I don't know whether you're going to
8    mark that or not but the other cell phone record
9    that I gave you this morning, that's the only copy
10   that we have of that too.
11       MR. BELSKY: Why don't we mark this as
12   7? Are these two copies of the same thing?
13       MR. MANN: I don't think so.
14       MR. BELSKY: I'll just combine them.
15       MR. MANN: Yeah, all cell phone records.
16       MR. BELSKY: I'll combine them with a
17   stapler and we'll mark that as 7.
18           (Exhibit 7 marked.)
19       MR. BELSKY: Why don't we just have him
20   identify Number 7?
21   Q    Number 7, is that the telephone records

Page 25

1    for other employees?
2    A    This is actually the cell phone records
3    from previous dates, from November and December.
4    Q    For this driver?
5    A    For this driver.
6        MR. MANN: Okay. See, what was the
7    second part of that? Is that also --
8        THE WITNESS: This is November into
9    December and this is December into January and the
10   one in question was mid-January.
11   Q    So the only records I have are telephone
12   records?
13       MR. MANN: No, it's underneath. Where
14   are the others at? Oh, here it is, here it is.
15   These are the ones I'm worried about. 7, that's
16   yours. You must have had that from what I already
17   provided you. They were the ones I gave you
18   beforehand.
19   A    This is for all other employees.
20       MR. BELSKY: Why don't we mark this as
21   8? And so 8 is the telephone records for all other

WALLS REPORTING, INC.
MARYLAND, D.C., & NORTHERN VIRGINIA - 410-647-6434

ca59d640-457e-11d7-b01c-00c0dfa55125

Page 26

1  employees.
2      A  On the date in question, yes.
3      Q  Date in question.
4          (Exhibit 8 marked.)
5      Q  Let me just clean up a couple of things.
6  So there was no question he was driving for you on
7  the date of the accident?
8      A  Correct.
9      Q  And he was delivering a load for you?
10     A  Uh-huh.
11     Q  And do you -- what is the company's
12 policy regarding payment of traffic tickets
13 received by a driver while they are in your
14 employment?
15     A  If it was for something that was, in
16 other words, like speeding, seat belt violations,
17 those type of things, the employee is responsible
18 for paying this.
19     Q  In this case I understand that the
20 employer received a ticket and paid it. Did you
21 pay it or did the employee pay it?

Page 27

1      A  The employee paid it.
2      Q  Do you know whether he was represented
3  by an attorney at the time the ticket was paid?
4      A  I do not know.
5      Q  Do you know whether anybody provided him
6  with any advice relative to payment of the ticket?
7      A  I do not know.
8      Q  I show you these photographs. These are
9  photographs of the vehicle. Well, before I do
10 that, did you inspect the vehicle when it came
11 back?
12     A  No, I did not.
13     Q  Did somebody from the company inspect
14 the vehicle when it came back?
15     A  I believe his supervisor did.
16     Q  Who was his supervisor?
17     A  Bob Brooks.
18     Q  Is he still working there?
19     A  He works out of our Virginia facility.
20     Q  What is that address?
21     A  5150 Innovation Way, no, I'm sorry,

Page 28

1  that's incorrect. I have it if you need it. I
2  don't know it by heart.
3          MR. BELSKY:  Off the record.
4          (Pause in the proceedings.)
5      A  I do not have it. I thought I did.
6          MR. MANN:  We'll get you that address.
7          THE WITNESS:  Yeah.
8      Q  That's fine.
9      A  It's Richmond, Virginia, Concrete Place,
10 I just don't know the number. Concrete Place,
11 Richmond, Virginia.
12     Q  That's probably fine. It's the same
13 name of the company, it's the same?
14     A  Yes.
15     Q  When a truck goes -- when this truck --
16 where did this truck leave, what facility did this
17 truck leave from?
18     A  Mohler Church Road, which is our
19 corporate office.
20     Q  In Pennsylvania?
21     A  Yes.

Page 29

1      Q  Now, before a truck goes out is it
2  inspected by the employee?
3      A  The drivers do a pretrip inspection,
4  yeah, they do their own.
5      Q  Do they sign a pretrip document that
6  they have inspected it?
7      A  I believe so, yes.
8      Q  Has that been supplied to us in this
9  case, do you know?
10     A  I don't think so. I don't know if --
11         MR. MANN:  I don't know if there's a
12 written record.
13     A  I'm not certain that we would have it
14 that long, I'll have to double-check.
15     Q  But there is a written document?
16     A  There generally is one.
17         MR. MANN:  We'll check for you. When he
18 goes back I'll check.
19     Q  And when a truck comes back is it
20 checked by someone to see whether or not there's
21 any damage to it?

8 (Pages 26 to 29)

ca59d640-457e-11d7-b01c-00c0dfa55125

Page 30

1    A  The employee is supposed to do a pretrip
2 and a post trip inspection of the vehicle.
3    Q  Well, how would you know that damage was
4 done to a vehicle on his trip if he didn't tell you
5 about it?
6    A  The supervisor is supposed to get the
7 pretrip and post trip and on the post trip it's
8 supposed to be listed what damage might have been
9 done if any.
10   Q  Well, if he doesn't check it out how
11 does the company know that the employee is being
12 honest?
13   A  If he doesn't record the damage?
14   Q  Yes.
15   A  It's noted by the supervisor.
16   Q  So the supervisor has to do his own
17 inspection?
18   A  He doesn't do a regular inspection but a
19 visual inspection if his supervisor happens to see
20 the truck come in and notice damage on it he would
21 ask the employee about it.

Page 31

1    Q  Okay. So basically you are relying on
2 the employee to be truthful on what the damage is
3 to the vehicle when he leaves and when he returns?
4    A  Generally.
5    Q  If a vehicle had a damaged rear mirror I
6 assume it would not go out on the road?
7    A  Yeah, that's correct. I believe so.
8    Q  No, it would not go out on the road?
9    A  Yeah.
10   Q  All right. And what about black scuff
11 mark, would that affect the vehicle going out on
12 the road?
13       MR. MANN: Do you know?
14   A  The black scuff — if it had a black
15 scuff mark on it?
16   Q  Yes, on the bumper.
17   A  It depends on where it would be. If it
18 was on the bumper it probably wouldn't affect it,
19 no.
20   Q  The company provided me with these
21 photographs of the vehicle.

Page 32

1       MR. BELSKY: I don't know if we ever got
2 color copies. If you have got the original, I
3 would appreciate it.
4       MR. MANN: I'm not sure.
5       MR. BELSKY: If you have them that would
6 be great, if you have color copies because these
7 aren't as clear as I would like them to be.
8       MR. MANN: What do you have there? Just
9 that one?
10      MR. BELSKY: Just that one.
11      MR. MANN: Okay. I mean is that --
12 that's all I have.
13      MR. BELSKY: Oh, okay.
14      MR. MANN: I think, unless you have
15 another copy. I'll look for it.
16      MR. BELSKY: Well, I have other photos.
17      MR. MANN: Let me see and I'll see if I
18 can find the originals. Are these the ones we
19 provided to you?
20      MR. BELSKY: They are of the truck, so
21 yes, you provided them to us.

Page 33

1       MR. MANN: Okay.
2      MR. BELSKY: Off the record.
3      (Discussion held off the record.)
4      MR. MANN: I have a lot of angles but
5 some of them don't show the other side of the truck
6 so I didn't really -- ignore that. I mean unless
7 you really need them, ignore that writing on there.
8 That's just the guys. Here is the copies of all
9 the ones I've got. See, some of them don't show
10 the area of, you know, they don't even show the
11 right side of the truck.
12      MR. BELSKY: Okay. I'll mark these and
13 then I'll have them color copied while we're doing
14 the other deposition.
15      MR. MANN: You can do that here?
16      MR. BELSKY: No, I'll run somebody out
17 to do it.
18      MR. MANN: Or I can get them and send
19 them to you.
20      MR. BELSKY: I'd just as soon send
21 somebody out while we're waiting.

9 (Pages 30 to 33)

Page 34

1    Q   I'm going to show you these photographs
2   and -- I may have the answer to the question here.
3   Do you know when these photographs were taken?
4    A   I'm not certain, no.
5    Q   Okay. The information on the top
6   indicated it was taken 1-26, '01 I assume?
7    MR. MANN: He wouldn't know anything
8   about that. That was done by the insurance
9   company, I can tell you that.
10    MR. BELSKY: Okay. So that's -- okay.
11    Q   Did the company do an inspection of the
12   vehicle when it came back after the accident?
13    A   I believe the supervisor did.
14    Q   And what did that show?
15    A   To my knowledge it showed the damage,
16   there was a damaged mirror and some other damage
17   that needed to be repaired.
18    Q   Was a report made?
19    A   A report made?
20    Q   Of the damage to the vehicle.
21    A   There was -- I don't know that a report

Page 35

1   was made of the damage. We, we leased the truck
2   through Ryder and generally there, whenever there's
3   damage to a vehicle that needs to be repaired we
4   take it out of service and we call Ryder and Ryder
5   repairs it then.
6    Q   Okay.
7    MR. BELSKY: Is that in the Ryder
8   documents?
9    MR. MANN: No, I don't think we've seen
10   it, I don't think we have it. Whatever they did to
11   the truck they did. I don't know if they had to do
12   anything to the truck, Ryder I'm talking about.
13    MR. BELSKY: Okay. Why don't we mark
14   this as a group as Exhibit Number 9?
15    (Exhibit 9 marked.)
16    MR. BELSKY: Exhibit 9 is two loose
17   photographs and six photographs that are on blue
18   purple type of backing.
19    MR. MANN: Actually I do have, I don't
20   think this is part of their file but I do have, I
21   think this was done by the guy who took those

Page 36

1   pictures.
2    MR. BELSKY: Okay.
3    MR. MANN: And you can mark that and
4   make a copy of it.
5    MR. BELSKY: Okay.
6    MR. MANN: It was below the deductible.
7    MR. BELSKY: Why don't you mark this as
8   10?
9    (Exhibit 10 marked.)
10    Q   Pardon me while I read this.
11    A   That's fine.
12    MR. MANN: Off the record.
13    (Discussion held off the record.)
14    MR. BELSKY: Could you tell me who took
15   these pictures?
16    MR. MANN: That's the insurer, that
17   would be whoever I identified that's doing the
18   investigation.
19    MR. BELSKY: Okay.
20    MR. MANN: I can tell you from the
21   documents.

Page 37

1    MR. BELSKY: Do you have the color
2   copies of those too?
3    MR. MANN: Yes. These are the ones I
4   gave you at the deposition.
5    MR. BELSKY: Okay. Do you want to put
6   them on a pile and that way I'll get them all color
7   copied?
8    Q   Just to clear things up I'm going to
9   show you these photographs which were marked in
10   Mr. Curtis' Deposition Exhibit 2. Have you ever
11   seen those photographs before?
12    A   I just saw them for the first time about
13   20 minutes ago.
14    Q   Okay.
15    MR. MANN: They were taken by Mr. Dixon,
16   who was identified in the Answers to
17   Interrogatories.
18    Q   That's not part of your investigation?
19    A   No.
20    Q   You never identified the point of impact
21   of the accident?

10 (Pages 34 to 37)

Page 38

1    A   No.
2        MR. BELSKY:  Put them on the pile.
3        MR. MANN:  Okay.
4        (Pause in the proceedings.)
5    Q   Now, my understanding in reading some of
6  your personnel information was that a bonus was
7  given out for good driving to employees?
8    A   That's correct.
9    Q   Did Mr. Martin ever receive a bonus for
10 good driving?
11   A   No.
12   Q   And how, what is the criteria for good
13 driving bonus?
14   A   First of all the individual has to be
15 employed for a complete quarter, full three months
16 of the calendar quarter year and then secondly they
17 have to be, have no accidents where they were at
18 fault and/or if they do have an accident, less than
19 250 dollars in damage I believe it was.
20   Q   The, and how long had he -- he had been
21 there for a quarter, had he not?

Page 39

1    A   No.  He had only been, I think his hire
2  date was October 2nd and so it wasn't a complete
3  calendar quarter, we do it by calendar quarters.
4    Q   Okay.  So the calendar quarter meaning
5  he would have to go from January, February, March?
6    A   Right, correct, before he would have
7  been eligible.
8    Q   He wouldn't have qualified because he
9  had the accident?
10   A   For which, I'm sorry?
11   Q   For this accident would this have
12 knocked his qualifications down or not?
13   A   It would depend on if the, if he was
14 determined to be at fault and if he was determined
15 to be at fault then he wouldn't have been eligible
16 for it.
17   Q   Did the company ever make that
18 determination?
19       MR. MANN:  Objection.
20   A   No.
21   Q   For that purpose?

Page 40

1    A   No.
2    Q   Explain to me the cell phone policy.
3    A   The drivers all have cell phones that
4  they can use, they're delivery drivers, we deliver
5  to residential customers as well as to stores, so
6  if they would be near a customer but were given bad
7  directions or something they use their cell phones
8  to call and find out where they're at or where they
9  need to be.
10   Q   Is this a phone that you provide the
11 driver?
12   A   Yes, uh-huh.
13   Q   Do some of the drivers have their own
14 personal cell phones?
15   A   I think one or two.
16   Q   And what is the policy regarding how
17 they would notify you they have their personal cell
18 phone, would they have to notify you?
19   A   They wouldn't have to notify us.
20   Q   Do you know whether Mr. Martin had a
21 personal cell phone?

Page 41

1    A   I do not know, I don't believe he did
2  but he may have, I just don't know.
3    Q   Did you ever ask him that question?
4    A   No.
5    Q   Mr. Martin had indicated at his
6  deposition that the only damage that he saw was to
7  the mirror.  Did he ever offer an explanation to
8  you why the mirror was broken?
9    A   He, I believe he said it was as a result
10 of his incident.  It was in our discussion when I
11 talked to him when he had called he said that --
12       MR. MANN:  You answered the question.
13 Objection.
14       MR. BELSKY:  Are you instructing him not
15 to answer when he called?
16       MR. MANN:  He answered the question, he
17 said --
18   Q   Okay.  What else did he tell you when he
19 first called you?
20       MR. MANN:  Objection for the same reason
21 as stated before.

WALLS REPORTING, INC.
MARYLAND, D.C., & NORTHERN VIRGINIA - 410-647-6434

ca59d640-457e-11d7-b01c-00c0dfa55125

Page 42

1    MR. BELSKY: Are you instructing him not
2  to answer?
3    MR. MANN: Yes.
4    Q   This call to you was before you even
5  notified the insurance carrier?
6    A   Yes.
7    MR. BELSKY: Is that still your
8  position?
9    MR. MANN: Yes. He testified it was for
10  the purpose of notifying the insurance carrier.
11    MR. BELSKY: Okay.
12    Q   Did he ever explain to you what the
13  bumper problem was caused by?
14    A   No.
15    Q   The pictures that we showed, those are
16  the ones involved in this accident I assume?
17    A   I assume.
18    Q   All right.
19    MR. MANN: He didn't take them.
20    MR. BELSKY: I know, I thought there
21  might be some kind of identifying mark, you know.

Page 43

1    Q   Now, tell me the process in which
2  Mr. Martin was hired. Do you have his personnel
3  file with you?
4    A   Yes.
5    Q   Why don't you take a look at his
6  personnel file.
7    A   Okay.
8    Q   Take us step by step how the hiring
9  process works.
10    A   Okay. Well, he completed an
11  application.
12    Q   Could I see the application?
13    A   Sure.
14    MR. MANN: I believe you've already got
15  a copy of that.
16    MR. BELSKY: Because it's back and
17  front, I know you gave them to me, but I'm going to
18  have it marked and we'll put it on the pile.
19    MR. MANN: Okay.
20    MR. BELSKY: All right. Could you mark
21  this as Exhibit 11?

Page 44

1    (Exhibit 11 marked.)
2    Q   Okay. So he fills out this application
3  that's been marked as Exhibit 11?
4    A   Yes, that's correct.
5    Q   And he indicated in this application
6  that he was involved in a prior accident; is that
7  correct?
8    A   Yes, uh-huh.
9    Q   Did you investigate when that accident
10  was?
11    A   What do you mean did we investigate?
12    Q   Well, when he filled out --
13    A   We talked to him about it.
14    Q   Okay. And what did he say?
15    A   He said that he had been, had made a
16  mistake, he was driving too fast, he was driving a,
17  I think a tanker, a milk truck or something like
18  that and the roads were wet.
19    Q   Did he say when that happened?
20    A   I believe he said it was in July of
21  2000.

Page 45

1    Q   Does it show anywhere on that report?
2    A   It's on one of the other, his other
3  applications.
4    Q   Can you show me the document that it's
5  on? I honestly didn't see it, but, again, I don't
6  know what I'm looking at.
7    (Document tendered.)
8    MR. MANN: Which one are you looking at
9  now so I can just see?
10    MR. BELSKY: The one marked Ryder.
11    MR. MANN: Okay. Ryder. You have that
12  one too.
13    MR. BELSKY: I'm sure I do. I just
14  don't know what I'm looking at when I see these
15  documents, that's why I need them explained to me.
16  Okay. Why don't we have this marked as 12?
17    (Exhibit 12 marked.)
18    Q   What's marked as Exhibit 12, where did
19  you acquire that from?
20    A   This he completed after his initial
21  hiring, this is a, something, or a job offer had

12 (Pages 42 to 45)

Page 46

1 been made then he completes this.
2    Q   So he completed that?
3    A   Yes.
4    Q   Maybe I missed something. So you
5 didn't -- it wasn't a Ryder truck that was involved
6 in that accident?
7    A   I'm sorry?
8    Q   We talked about --
9    A   In this accident, no, no. This is
10 his --
11    Q   Okay. Go ahead.
12    A   This is his application, this is an
13 extension of his application.
14    Q   Okay. Can I see it then?
15    A   Uh-huh.
16    Q   What if any follow-up did you do to find
17 out more specific facts regarding this prior
18 accident?
19    A   We sent a letter to his previous
20 employers.
21    Q   And did you receive responses to those?

Page 47

1    A   Yes.
2    Q   Can I see those?
3    A   Sure.
4    Q   The fact that these forms say Ryder on
5 it, what is the significance of that?
6    A   There is none, Ryder provides us with
7 the driver qualification file and with blank copies
8 of all the forms.
9    Q   So this is sort of a give me from them
10 to you for --
11    A   Right. We purchase them from them, from
12 Ryder to do our --
13    Q   On the one that we're talking about,
14 name of previous employer, Neo Plan, USA.
15    A   Uh-huh.
16    Q   I don't see any information they gave
17 you. Is that a fair statement, they gave you no
18 information regarding him?
19    A   Right.
20    Q   Okay. And the information that was
21 given to you by Clouse Trucking?

Page 48

1    A   Uh-huh.
2    Q   Okay. It said that he backed into two
3 milk houses at farms?
4    A   Uh-huh.
5    Q   And it said he jackknifed on wet road
6 and hit a car coming in opposite direction?
7    A   Uh-huh.
8    Q   And he had a heavy foot, I assume that
9 means he was a speeder?
10    A   I don't know what that means.
11    Q   You don't know what a heavy foot is?
12    A   I think it's subjective, what one person
13 may determine to be a heavy foot as another.
14    Q   But what does the term mean in trucking?
15    MR. MANN: I object to that. He doesn't
16 know what they meant.
17    Q   Do you know what it means?
18    A   In general I would think a heavy foot
19 means that somebody speeds but I think it's
20 subjective in terms of who decides that.
21    Q   Did you investigate these incidences any

Page 49

1 more than the information you got back from --
2    A   No.
3    Q   -- Clouse? So you don't know the dates
4 of these incidences?
5    A   No.
6    MR. BELSKY: Have I marked those? Okay.
7 Why don't we mark this?
8    (Exhibit 13 marked.)
9    Q   Are these the only two responses you got
10 from previous prior employers?
11    A   Yes.
12    Q   There were more prior employers?
13    A   Yes.
14    Q   How many prior employers were there?
15    A   I believe from -- do we have his
16 application? He has listed down one other one
17 other than being self-employed.
18    Q   Okay. The one other one was --
19    A   United Sleep Product.
20    Q   United Sleep Product. And he wasn't a
21 driver for that company?

13 (Pages 46 to 49)

ca59d640-457e-11d7-b01c-00c0dfa55125

Page 50

1    A    Not that we're aware of.
2    Q    Okay. And then he went into landscaping
3  in '97. There came a time in his prior history
4  that he had lost his license. Did he tell you that
5  he lost his license on the application?
6    A    It was on his, it was listed on his
7  application that he had lost it due to points
8  violations.
9    Q    Okay. And did you make an inquiry as to
10  what the points violations were?
11    A    I don't remember.
12    Q    I think that they were supplied. Have
13  you ever seen that document?
14    A    Oh, yes, this is his MVR, his motor
15  vehicle record.
16    Q    And can you tell me what it says?
17    A    It says that he had a violation
18  September 3rd of '98 for exceeding the maximum
19  speed.
20    Q    Anything else?
21    A    And then he had a suspension as a result

Page 51

1  of that.
2    Q    Just the one violation?
3    A    He had the suspension then he had the
4  driving too fast for conditions July 19th.
5    Q    Okay. What if any -- I ask this be
6  marked as the next exhibit.
7        (Exhibit 14 marked.)
8    MR. BELSKY: So this document is marked
9  as Exhibit Number 14.
10    MR. MANN: I don't need a copy of that
11  one. That was from your file.
12    MR. BELSKY: Right.
13    Q    What if any impact did this have on his
14  application for employment?
15    A    None at that point. We had, he had
16  talked to us about his incident, he had a valid CDL
17  class A license that he had gotten in September of
18  2000 and so we felt that he was a valid qualified
19  driver. He had, the state had just certified him
20  for CDL and we don't require CDL.
21    Q    So what you're saying is if the state

Page 52

1  qualifies him his prior record is not important to
2  you?
3    A    No, I'm not saying that, I'm saying that
4  the state had qualified him for a CDL and we looked
5  at his prior record, he had talked about the one
6  incident that he had had recently, the speeding
7  violation was from '98 and we felt he had come with
8  two good references.
9    Q    The good references being the one person
10  that didn't say anything?
11    A    No, no, no, from other employees.
12    Q    Oh, other employees.
13    A    Uh-huh.
14    Q    Do you have those with you? I think I
15  have those here, I just want to make sure.
16    A    It was verbal references, there was two
17  guys that were employees with us that went to his
18  church, went to church with him.
19    Q    Do you know who they were?
20    A    Bob Brooks and Allan Roden.
21    Q    If it's on the back of this form they

Page 53

1  were written --
2    A    It's back on the --
3    Q    I'm sorry?
4    A    It's on his application, on the back
5  part of the application that I have it listed that
6  he knows Bob Brooks and I think it's referenced on
7  the third page.
8    Q    Okay. So on the employment application
9  it has the reference on the back, remarks,
10  excellent candidate, enjoys driving, feels like he
11  has leadership potential. Is that what you're
12  referring to?
13    A    Yeah.
14    Q    I'm going to show you this document and
15  maybe you can tell me what this is.
16    A    Okay. This is the same one we just
17  looked at, it's part of his application. This is
18  the Ryder form.
19    Q    Okay. Let me just make sure.
20    A    That's this one. Exhibit 12 I guess.
21    Q    Can you tell me the date that he got his

14 (Pages 50 to 53)

ca59d640-457e-11d7-b01c-00c0dfa55125

Page 54

1   license back after suspension?
2       A   They restored it February 11th of '99.
3       Q   All right. So we were going through the
4   process, he fills out an application and then
5   what's the next step that you take as far as
6   deciding whether to hire him or not?
7       A   He filled out the application, I
8   interviewed him.
9       Q   Okay. And there's no form of the
10  interview. Is there any written notes?
11      A   Just the notes on the back of the
12  application.
13      Q   The notes on the back of the application
14  which you already spoke about.
15      A   Uh-huh.
16      Q   Does he get a physical examination?
17      A   Yes.
18      Q   Who does the physical examination?
19      A   A company, Physician Crossroads Family
20  Medical Center.
21      Q   And who pays for that?

Page 55

1       A   We do, the company does.
2       Q   And is part of that examination an eye
3   examination?
4       A   I believe so, yeah.
5       Q   Do you have a copy of that report?
6       A   No, I do not have a copy of that. I see
7   a drug screen. The medical facility would have a
8   copy.
9       Q   What is the name of the medical
10  facility?
11      A   Crossroads Family Medical Center.
12      Q   Where are they located at?
13      A   They're in Brownstown, Pennsylvania.
14          MR. MANN: You do have this document,
15  which is the only one we have that has got
16  Crossroads Family Medical Center on it.
17          MR. BELSKY: The drug screen?
18          MR. MANN: Yes.
19          MR. BELSKY: Yes, I do have that.
20          MR. MANN: It's the same company,
21  same —

Page 56

1       A   Same organization.
2       Q   Great. Okay. So we have him physical
3   examed and the company does not get a report back
4   or it's just not in the file?
5       A   We get, there's a medical examiner's
6   certificate that stated that he's cleared with
7   corrective lenses.
8       Q   Let me make sure I have that here.
9   Okay. Let me see what you have got. I know I have
10  it.
11          (Document tendered.)
12          MR. BELSKY: All right. Why don't we
13  mark this and we'll give it back to him? This is
14  the copy of the Social Security number and the
15  medical examiner's certificate.
16          (Exhibit 15 marked.)
17      Q   Okay. So we have an exam. Does he go
18  out for a road test?
19      A   Generally he goes out for a road test,
20  he goes along with another driver first of all to,
21  as a ride along, what we call a ride along, where

Page 57

1   he watches, helps, that type of thing.
2       Q   Okay. And did he do okay on that?
3       A   Yeah, I believe so.
4       Q   Is there a report that's generated by
5   that?
6       A   I don't have that, no.
7       Q   You don't have it or there is no such
8   report?
9       A   There is and, but I don't have one
10  listed in his file.
11      Q   Okay. Is there a reason why we don't
12  have that one?
13      A   I'm not certain, no.
14      Q   There's also a written test?
15      A   That's a part of that. The written
16  test, I don't know that we have one.
17      Q   All right. Here. I'll give you this
18  back.
19      A   Oh, okay.
20      Q   I'll take this out of this pile and put
21  it in this pile and then you can have that back.

WALLS REPORTING, INC.
MARYLAND, D.C., & NORTHERN VIRGINIA - 410-647-6434

ca59d640-457e-11d7-b01c-00c0dfa55125

Page 58

1    A  Okay. That works.
2    Q  Let me show you this. Is this the
3  written test? And that's my guess.
4    A  This is for lock out/tag out, this is
5  for hazard communications.
6    Q  So this is not a written test?
7    A  It's a written test but it's not for
8  driving.
9    Q  Not for driving, okay.
10   A  Right.
11   Q  Do you have a copy of the written test
12 that he took as part of his employment application?
13   A  No.
14   Q  Is there a reason why we don't have that
15 test?
16   A  He had a CDL class A license and I think
17 we determined that if they have a CDL class A that
18 that, they met the burden for not having a written
19 test.
20   Q  So he doesn't have to take a written
21 test?

Page 59

1    A  Right.
2    Q  And he did not take a written test?
3    A  Correct.
4    Q  You waived him in. Let me ask you, is
5  this a copy of -- this was supplied to us as the
6  new cell phone policy. Is that the policy?
7    A  Yes.
8      MR. BELSKY: Okay. Why don't we mark
9  that as an exhibit?
10     (Exhibit 16 marked.)
11   Q  You provided us with your insurance
12 information regarding this case but I'm not sure
13 that -- I want to make sure I understand what it
14 says. Am I correct that your deductible is a
15 thousand dollars?
16   A  I believe so.
17   Q  And that the coverage is over a million
18 dollars?
19   A  I believe so, yeah. Is a million.
20   Q  Let me just go through my list, I may be
21 finished.

Page 60

1      (Pause in the proceedings.)
2    Q  The one thing that confuses me is that
3  the company never did an inspection of the vehicle,
4  only Ryder did the inspection of the vehicle?
5    A  The only inspection that we would have
6  done I believe would have been a visual inspection
7  by the supervisor noting what damage needed to be
8  repaired and then calling Ryder and saying we need
9  a vehicle to get fixed.
10   Q  Is there a written document that shows
11 that?
12   A  That I'm not certain of, I would have to
13 check with the warehouse supervisor.
14   Q  Would you do that?
15   A  Sure.
16   Q  And notify your attorney and get me a
17 copy of that?
18     MR. MANN: Yeah, we'll try and get you
19 that if there's a record from before when he took
20 the truck out, before he took it out and the one
21 when he came back the day of the accident.

Page 61

1      MR. BELSKY: Okay, great. I have
2  nothing further.
3      MR. MANN: I don't have any questions.
4  Mr. Keener will waive the reading and signing of
5  the deposition.
6      MR. BELSKY: All right.
7      (Deposition concluded at 11:04 a.m.)
8      **********
9
10
11
12
13
14
15
16
17
18
19
20
21

16 (Pages 58 to 61)

ca59d640-457e-11d7-b01c-00c0dfa55125

Page 62

1   STATE OF MARYLAND, COUNTY OF CARROLL:
2        I, Sharon A. Beaty, a Notary Public in and
3   for the State of Maryland, County of Carroll, do
4   hereby certify the within named BRENT KEENER
5   personally appeared before me at the time and place
6   herein set out and, after having been duly sworn by
7   me according to law, was interrogated by counsel.
8        I further certify that the examination was
9   recorded stenographically by me and then
10  transcribed from my stenographic notes to the
11  within typewritten matter in a true and accurate
12  manner. I further certify that the stipulations
13  contained herein were entered into by counsel in my
14  presence. I further certify that I am not of
15  counsel to any of the parties, nor an employee of
16  counsel, nor related to any of the parties, nor in
17  any way interested in the outcome of this action.
18       AS WITNESS my hand and notarial seal this
     17th day of February, 2003, at Baltimore, Maryland.
19
20       _____
             Sharon A. Beaty, Notary Public
21

17 (Page 62)

CARROLL, et al. v. MARTIN, et al.
Case 1:02-cv-02084-MJG    Document 23-4    Filed 04/28/2003    Page 19 of 24
BRENT KEENER, 2-5-03

Page 63

**A**

able 16:2
about 5:18 11:12 12:16
  13:17,17 15:11 17:3
  18:14,20 19:1 21:15
  21:17 25:15 30:5,21
  31:10 34:8 35:12
  37:12 44:13 46:8
  47:13 51:16 52:5
  54:14
above 9:6
accident 3:11 6:3 7:16
  10:6 13:5 15:3,4 16:8
  16:13 20:21 23:2,6
  26:7 34:12 37:21
  38:18 39:9,11 42:16
  44:6,9 46:6,9,18
  60:21
accidents 11:15 38:17
according 62:7
accurate 62:11
acquire 45:19
action 1:5 3:9 10:20
  11:1,2 62:17
actions 15:8
active 14:11
actually 14:16 25:2
  35:19
additional 7:14 10:1
address 27:20 28:6
adequate 23:15
administration 13:1
advice 27:6
affect 31:11,18
affiliation 12:10
after 15:11 17:7,9
  20:21 23:19 34:12
  45:20 54:1 62:6
again 10:12 45:5
ago 37:13
agreed 5:2,6
ahead 46:11
al 1:3,7
Allan 52:20
along 56:20,21,21
already 5:18 7:19 8:1
  15:1 21:10,12 25:16
  43:14 54:14
and/or 38:18
angles 33:4
angry 22:13
another 9:10 20:19
  22:9 32:15 48:13
  56:20
answer 6:16,21 7:6
  16:16 34:2 41:15 42:2

answered 41:12,16
Answers 14:18 37:16
anybody 27:5
anymore 15:20
anything 6:20 34:7
  35:12 50:20 52:10
anywhere 45:1
appeal 21:15,18
APPEARANCES 2:1
appeared 62:5
application 3:18,19
  22:20 43:11,12 44:2,5
  46:12,13 49:16 50:5,7
  51:14 53:4,5,8,17
  54:4,7,12,13 58:12
applications 45:3
Appraisal 3:16
appreciate 10:16 32:3
area 19:19 33:10
areas 15:14
around 15:21 19:6 22:9
asking 7:4
assistant 8:18
assume 6:16 19:16 31:6
  34:6 42:16,17 48:8
Attached 3:6
attorney 5:18 17:1 27:3
  60:16
available 22:10
Avenue 2:8
aware 22:16 23:1,5
  50:1
a.m 1:13 61:7

**B**

B 2:8
back 15:15 27:11,14
  29:18,19 34:12 43:16
  49:1 52:21 53:2,4,9
  54:1,11,13 56:3,13
  57:18,21 60:21
backed 48:2
backing 35:18
bad 40:6
Baltimore 1:15 2:4
  62:18
base 23:18
Based 20:15
basically 22:6 31:1
basis 23:9
Beaty 1:16,21 62:2,20
before 1:16 5:20 6:10
  7:20 17:7 18:13 23:2
  27:9 29:1 37:11 39:6
  41:21 42:4 60:19,20
  62:5

beforehand 25:18
began 15:21
BEHALF 2:2,7
being 30:11 49:17 52:9
believe 17:9 18:10,12
  18:21 19:2,5 20:4,17
  20:18 21:1,2 27:15
  29:7 31:7 34:13 38:19
  41:1,9 43:14 44:20
  49:15 55:4 57:3 59:16
  59:19 60:6
below 23:13 36:6
Belsky 1:14 2:3,3 3:5
  5:15,17 10:16 14:20
  15:1 16:17 17:13 18:1
  18:4 20:11 24:3,11,14
  24:16,19 25:20 28:3
  32:1,5,10,13,16,20
  33:2,12,16,20 34:10
  35:7,13,16 36:2,5,7
  36:14,19 37:1,5 38:2
  41:14 42:1,7,11,20
  43:16,20 45:10,13
  49:6 51:8,12 55:17,19
  56:12 59:8 61:1,6
belt 26:16
Ben 9:3 11:4
BENJAMIN 1:6
best 19:11
between 5:3 16:21 22:2
black 31:10,14,14
blank 47:7
blue 35:17
Bob 21:9 27:17 52:20
  53:6
bonus 38:6,9,13
box 15:13
break 6:17
Brent 1:12 3:5 5:11
  12:7 62:4
broken 41:8
Brooks 21:9 27:17
  52:20 53:6
brought 7:14
Brownstown 55:13
bumper 31:16,18 42:13
burden 58:18
Bureau 4:3
business 14:11

**C**

calendar 38:16 39:3,3,4
call 18:11 19:4 35:4
  40:8 42:4 56:21
called 5:12 18:12,14,14
  18:21 19:2,3,5,8,9,13
  62:5

41:11,15,19
calling 60:8
calls 3:12,14 20:8,9
came 10:3 27:10,14
  34:12 50:3 60:21
candidate 53:10
car 48:6
card 4:6
carrier 17:5,11,18 42:5
  42:10
Carroll 1:3 62:1,3
case 9:3 12:11 17:2
  26:19 29:9 59:12
category 23:12
caused 9:7 42:13
CDL 23:16 51:16,20,20
  52:4 58:16,17
cell 4:7 18:9,10,16 19:5
  24:1,8,15 25:2 40:2,3
  40:7,14,17,21 59:6
Cellular 3:13
cent 23:6
Center 54:20 55:11,16
certain 20:6 29:13 34:4
  57:13 60:12
certificate 4:6 56:6,15
certified 51:19
certify 62:4,8,12,14
chance 18:17 20:20
charge 12:20 13:11
Charges 3:13
Charles 1:15 2:4
check 29:17,18 30:10
  60:13
checked 29:20
church 28:18 52:18,18
Civil 1:5
claim 6:7 16:20,20
  17:17
claimant 9:2,7
class 23:16,17 51:17
  58:16,17
clean 26:5
clear 11:5 32:7 37:8
cleared 56:6
Clerk 5:7
Clouse 47:21 49:3
code 19:19
color 32:2,6 33:13 37:1
  37:6
combine 24:14,16
come 16:2 30:20 52:7
comes 29:19
coming 23:2 48:6
commencing 1:13

commission 6:10
communicating 6:17
communications 58:5
comp 6:6
company 10:21 13:6
  14:2,5 15:8 19:17
  21:14 22:9 27:13
  28:13 30:11 31:20
  34:9,11 39:17 49:21
  54:19 55:1,20 56:3
  60:3
company's 26:11
compensation 8:10,14
complete 38:15 39:2
completed 43:10 45:20
  46:2
completes 46:1
concerning 9:9
concluded 61:7
Concrete 28:9,10
conditions 51:4
confuses 60:2
consult 17:1
contained 62:13
continue 20:16
continued 4:2
conversation 16:18
  18:6 20:15 22:2
conversations 18:20
copied 33:13 37:7
copies 24:12 32:2,6
  33:8 37:2 47:7
copy 24:6,9 32:15 36:4
  43:15 51:10 55:5,6,8
  56:14 58:11 59:5
  60:17
corporate 28:19
corporation 13:19,20
  13:20
correct 7:16 10:4,8
  11:16 19:18 23:3 26:8
  31:7 38:8 39:6 44:4,7
  59:3,14
corrective 56:7
correctly 10:6
counsel 5:3 7:13 11:18
  62:7,13,15,16
County 8:14 62:1,3
couple 22:8 26:5
court 1:1 5:8 6:11,12
  8:3
coverage 59:17
Credits 3:13
criteria 38:12
Crossroads 54:19
  55:11,16

CARROLL, et al. v. MARTIN, et al.    Case 1:02-cv-02084-MJG    Document 23-4    Filed 04/28/2003    Page 20 of 24    BRENT KEENER, 2-5-03

Page 64

Credits 3:13
criteria 38:12
Crossroads 54:19
  55:11,16
CSR 1:21
Curtis 37:10
customer 40:6
customers 40:5

**D**
damage 29:21 30:3,8
  30:13,20 31:2 34:15
  34:16,20 35:1,3 38:19
  41:6 60:7
damaged 31:5 34:16
date 7:15 13:5 18:21
  26:2,3,7 39:2 53:21
dates 25:3 49:3
day 17:6 18:16 60:21
  62:18
deal 18:4
December 25:3,9,9
decides 48:20
deciding 54:6
decision 21:10,12
deductible 36:6 59:14
defendant 12:11
Defendants 1:8 2:7
deliver 15:13,13 20:16
  40:4
delivering 26:9
delivery 40:4
department 4:3 12:21
depend 39:13
depends 31:17
deposition 1:11 3:7 5:4
  5:7,19,19 7:11 15:4
  33:14 37:4,10 41:6
  61:5,7
describe 12:19
describing 9:6
deserving 23:20
determination 15:19
  16:6 39:18
determine 8:15 10:21
  17:17 23:13 48:13
determined 23:14
  39:14,14 58:17
different 10:21
direction 48:6
directions 40:7
discharge 11:3
disclosed 14:17
discovery 8:3
discussion 16:21 33:3
  36:13 41:10

distribution 13:9,16,16
DISTRICT 1:1,1
Division 1:2
Dixon 37:15
document 3:16 8:7,9,13
  9:10 10:18 18:15 20:7
  29:5,15 45:4,7 50:13
  51:8 53:14 55:14
  56:11 60:10
documents 15:2 35:8
  36:21 45:15
doing 23:15 33:13
  36:17
dollars 38:19 59:15,18
done 30:4,9 34:8 35:21
  60:6
double-check 29:14
down 7:3,5 9:21 20:19
  39:12 49:16
drive 15:13
driver 3:19 4:3 10:11
  15:9 20:19 25:4,5
  26:13 40:11 47:7
  49:21 51:19 56:20
drivers 29:3 40:3,4,13
driver's 3:11 4:5 15:3
driving 4:4 15:20 26:6
  38:7,10,13 44:16,16
  51:4 53:10 58:8,9
drug 55:7,17
due 50:7
duly 5:12 62:6

**E**
each 7:7
earlier 18:12
eight 12:18 13:15
either 10:19
eligible 8:15 39:7,15
employed 38:15
employee 8:12,15,20
  26:17,21 27:1 29:2
  30:1,11,21 31:2 62:15
employees 25:1,19 26:1
  38:7 52:11,12,17
employer 3:8,20 8:8
  26:20 47:14
employers 46:20 49:10
  49:12,14
employment 3:18,19
  11:13 16:3 22:12,19
  23:2 26:14 51:14 53:8
  58:12
enjoys 53:10
entered 62:13
entitled 3:16

equity 14:1,4
Esquire 2:3,8
essence 22:2
estimate 19:11
et 1:3,7
evaluation 11:21,21
even 33:10 42:4
ever 5:19 7:19 13:14
  32:1 37:10 38:9 39:17
  41:3,7 42:12 50:13
everything 5:18
exactly 19:3
exam 56:17
examined 56:3
examination 3:4 5:12
  5:15 54:16,18 55:2,3
  62:8
examiner's 4:6 56:5,15
exceeding 50:18
excellent 23:12 53:10
exhibit 7:10 8:7 11:6
  15:5 20:8,12,13 24:18
  26:4 35:14,15,16 36:9
  37:10 43:21 44:1,3
  45:17,18 49:8 51:6,7
  51:9 53:20 56:16 59:9
  59:10
Exhibits 3:6 4:2 5:10
  15:6
explain 40:2 42:12
explained 5:18 45:15
explanation 41:7
extension 46:13
eye 55:2

**F**
facility 27:19 28:16
  55:7,10
fact 47:4
facts 46:17
fair 47:17
familiar 20:3
Family 54:19 55:11,16
far 8:4 54:5
farms 48:3
fast 44:16 51:4
fault 15:19 16:6 38:18
  39:14,15
Fax 2:5,10
February 1:12 39:5
  54:2 62:18
feels 53:10
felt 23:15,19 51:18 52:7
file 10:9,11 14:17 17:17
  35:20 43:3,6 47:7
  51:11 56:4 57:10

filing 5:7
filled 8:18 44:12 54:7
fills 8:17 44:2 54:4
final 9:6
find 10:14 11:18 17:20
  32:18 40:8 46:16
fine 6:18 22:13 28:8,12
  36:11
finish 7:5
finished 59:21
first 11:12,15 15:10
  17:1,5,10 22:8 23:9
  37:12 38:14 41:19
  56:20
firsthand 9:8,11,16
  10:2
fixed 60:9
Floor 1:15 2:4
follows 5:14
follow-up 46:16
foot 48:8,11,13,18
forgot 12:4
form 3:9,11 9:4,5,19
  10:20,21 14:16 52:21
  53:18 54:9
forms 47:4,8
found 17:3 18:13
from 3:20 7:13 18:11
  21:15 25:3,3,16 27:13
  28:17 36:20 39:5
  45:19 47:9,11,11 49:1
  49:10,15 51:11 52:7
  52:11 60:19 62:10
front 43:17
full 38:15
function 9:13,14 12:19
further 5:6 61:2 62:8
  62:12,14

**G**
gave 24:9 25:17 37:4
  43:17 47:16,17
general 48:18
generally 29:16 31:4
  35:2 56:19
generated 57:4
gentleman 22:5
give 6:16 16:11 22:1
  47:9 56:13 57:17
given 38:7 40:6 47:21
giving 23:10
go 8:6 31:6,8 39:5 46:11
  56:17 59:20
goes 28:15 29:1,18
  56:19,20
going 6:18 7:9 8:5

  11:19 16:15 20:7
  22:11 24:7 31:11 34:1
  37:8 43:17 53:14 54:3
good 7:8 38:7,10,12
  52:8,9
gotten 10:12 51:17
great 32:6 56:2 61:1
group 35:14
guess 18:4 53:20 58:3
guy 35:21
guys 33:8 52:17

**H**
half 11:12
hand 62:18
hands 22:14
happened 16:9,14
  44:19
happens 30:19
having 5:12 7:9 21:15
  58:18 62:6
hazard 58:5
head 11:7
heads 7:1
hearing 21:7
heart 28:2
heavy 48:8,11,13,18
held 13:12,21 33:3
  36:13
helps 57:1
Henry 2:3 5:17
her 7:8
him 15:20 16:8,16
  17:10,14,15,16 18:7
  18:14 19:3,4,5,13
  20:16,21 21:2,9,15
  22:2,6,8,11 23:10,18
  24:19 27:5 41:3,11,14
  42:1 44:13 47:18
  51:19 52:1,4,18 54:6
  54:8 56:2,13 59:4
hire 39:1 54:6
hired 15:12 43:2
hiring 43:8 45:21
history 8:11 50:3
hit 15:12 48:6
honest 30:12
honestly 45:5
houses 48:3
human 12:12,15,20
  13:7,14

**I**
identified 36:17 37:16
  37:20
identify 8:6 10:18

CARROLL, et al. v. MARTIN, et al.    Case 1:02-cv-02084-MJG    Document 23-4    Filed 04/28/2003    Page 21 of 24    BRENT KEENER, 2-5-03

Page 65

**human** 12:12,15,20
  13:7,14

**I**

**identified** 36:17 37:16
  37:20
**identify** 8:6 10:18
  24:20
**identifying** 42:21
**ignore** 33:6,7
**impact** 37:20 51:13
**important** 52:1
**incidences** 11:11,11,14
  22:7 48:21 49:4
**incident** 9:6,9,11 10:7
  13:18 15:11,18 17:6
  19:1,2 23:16 41:10
  51:16 52:6
**incidents** 10:3
**included** 10:9
**incoming** 19:4,10 20:1
**incorrect** 28:1
**increase** 23:8,10,20
**INDEX** 3:1 4:1
**indicate** 9:2
**indicated** 10:5 34:6
  41:5 44:5
**indicating** 11:7
**individual** 9:8 38:14
**information** 3:20 8:2
  9:9,21 10:1 34:5 38:6
  47:16,18,20 49:1
  59:12
**initial** 45:20
**Innovation** 27:21
**inquiry** 50:9
**inspect** 27:10,13
**inspected** 29:2,6
**inspection** 29:3 30:2,17
  30:18,19 34:11 60:3,4
  60:5,6
**instruct** 16:16
**instructing** 41:14 42:1
**insurance** 16:20 17:18
  34:8 42:5,10 59:11
**insurer** 36:16
**interested** 62:17
**interrogated** 62:7
**Interrogatories** 14:18
  37:17
**interrupt** 23:21
**interview** 54:10
**interviewed** 54:8
**investigate** 44:9,11
  48:21
**investigation** 36:18

37:18
**involved** 42:16 44:6
  46:5

**J**

**J** 1:6
**jackknifed** 48:5
**Jan** 8:18
**January** 4:4 23:5 25:9
  39:5
**job** 12:19 23:15 45:21
**July** 44:20 51:4
**just** 6:2,10,15 11:5
  13:17 15:7 18:7,17
  19:14 20:14 21:8 22:1
  23:21 24:5,6,14,19
  26:5 28:10 32:8,10
  33:8,20 37:8,12 41:2
  45:9,13 51:2,19 52:15
  53:16,19 54:11 56:4
  59:20

**K**

**Keener** 1:12 3:3 5:11
  12:7,8,9,10 16:19
  61:4 62:4
**keep** 24:6
**kind** 42:21
**Kline** 3:16
**knocked** 39:12
**know** 5:17 8:4 9:10,18
  10:19 11:20 22:7,7,13
  24:5,7 27:2,4,5,7 28:2
  28:10 29:9,10,11 30:3
  30:11 31:13 32:1
  33:10 34:3,7,21 35:11
  40:20 41:1,2 42:20,21
  43:17 45:6,14 48:10
  48:11,16,17 49:3
  52:19 56:9 57:16
**knowledge** 9:11,16
  10:2 34:15
**knows** 53:6

**L**

**L** 2:3
**LamTech** 12:11 13:19
**Lancaster** 6:9 8:14
**landscaping** 50:2
**language** 7:7
**later** 18:5
**law** 1:13 62:7
**lawsuit** 17:4
**leadership** 53:11
**leased** 35:1
**leave** 28:16,17

**leaves** 31:3
**lenses** 56:7
**less** 38:18
**let** 10:14 24:5 26:5
  32:17 53:19 56:8,9
  58:2 59:4,20
**letter** 46:19
**license** 4:5 22:17 23:17
  23:18 50:4,5 51:17
  54:1 58:16
**Licensing** 4:4
**like** 6:13 23:11 26:16
  32:7 44:17 53:10
**limb** 15:12
**list** 59:20
**listed** 30:8 49:16 50:6
  53:5 57:10
**little** 12:17
**load** 20:16 26:9
**located** 55:12
**lock** 58:4
**log** 3:12,14
**long** 6:18 12:14 13:12
  29:14 38:20
**look** 18:17 32:15 43:5
**looked** 22:9 23:10,11
  52:4 53:17
**looking** 10:17 11:20
  15:21 45:6,8,14
**loose** 35:16
**lost** 50:4,5,7
**lot** 33:4

**M**

**made** 15:19 21:10,13
  34:18,19 35:1 44:15
  46:1
**majority** 14:9
**make** 16:5 19:11 24:6
  36:4 39:17 50:9 52:15
  53:19 56:8 59:13
**manager** 13:8,14
**Mann** 2:8 10:14 11:19
  14:15,21 16:15,18
  17:14 18:3 23:21 24:4
  24:13,15 25:6,13 28:6
  29:11,17 31:13 32:4,8
  32:11,14,17 33:1,4,15
  33:18 34:7 35:9,19
  36:3,6,12,16,20 37:3
  37:15 38:3 39:19
  41:12,16,20 42:3,9,19
  43:14,19 45:8,11
  48:15 51:10 55:14,18
  55:20 60:18 61:3
**manner** 62:12

**many** 6:1 49:14
**March** 39:5
**mark** 19:7,12 24:8,11
  24:17 25:20 31:11,15
  33:12 35:13 36:3,7
  42:21 43:20 49:7
  56:13 59:8
**marked** 7:10 8:7 11:6
  14:20 15:2,4,6 20:1,8
  20:11,13 24:1,18 26:4
  35:15 36:9 37:9 43:18
  44:1,3 45:10,16,17,18
  49:6,8 51:6,7,8 56:16
  59:10
**Martin** 1:6 9:3 11:4
  14:6,9 16:19 17:8,10
  38:9 40:20 41:5 43:2
**Maryland** 1:1,15 62:1
  62:3,18
**matter** 6:5 62:11
**maximum** 50:18
**may** 10:12 34:2 41:2
  48:13 59:20
**maybe** 12:1 15:16 46:4
  53:15
**MD** 2:4,9
**mean** 11:14 32:11 33:6
  44:11 48:14
**meaning** 39:4
**means** 48:9,10,17,19
**meant** 48:16
**medical** 4:6 54:20 55:7
  55:9,11,16 56:5,15
**meet** 20:20
**meeting** 22:3
**met** 21:2 58:18
**Michael** 2:8
**mid-January** 25:10
**might** 30:8 42:21
**milk** 44:17 48:3
**million** 59:17,19
**minority** 14:8
**minutes** 37:13
**mirror** 31:5 34:16 41:7
  41:8
**missed** 46:4
**mistake** 44:16
**MJG-02-CV-2084** 1:6
**Mohler** 28:18
**month** 11:21 13:17
  15:11
**months** 11:12,15 15:11
  20:14 22:8 23:19
  38:15
**more** 46:17 49:1,12
**morning** 24:9

**motor** 50:14
**municipalities** 15:15
**must** 25:16
**MVR** 50:14
**myself** 18:7 21:8

**N**

**name** 5:16 12:5,7 28:13
  47:14 55:9
**named** 9:5 62:4
**near** 40:6
**need** 6:20 24:6 28:1
  33:7 40:9 45:15 51:10
  60:8
**needed** 34:17 60:7
**needs** 35:3
**Neo** 47:14
**never** 37:20 60:3
**new** 4:7 59:6
**next** 21:2 51:6 54:5
**Nodding** 11:7
**nods** 7:1
**none** 47:6 51:15
**normal** 7:7
**Northern** 1:2
**notarial** 62:18
**Notary** 1:16 62:2,20
**noted** 30:15
**notes** 54:10,11,13 62:10
**nothing** 5:13 61:2
**notice** 1:11 3:7 7:11
  30:20
**notified** 17:11 42:5
**notify** 17:5 40:17,18,19
  60:16
**notifying** 42:10
**noting** 60:7
**November** 25:3,8
**number** 9:1 19:16 20:4
  24:1,3,4,20,21 28:10
  35:14 51:9 56:14
**numbers** 19:21 20:3
**numerically** 20:2

**O**

**object** 48:15
**Objection** 16:15 39:19
  41:13,20
**occasions** 6:1
**October** 39:2
**off** 8:5 28:3 33:2,3
  36:12,13
**offer** 41:7 45:21
**office** 9:5 19:8,9 21:9
  28:19
**offices** 1:13

CARROLL, et al. v. MARTIN, et al.    Case 1:02-cv-02684-MJG    Document 23-4    Filed 04/28/2003    Page 22 of 24    BRENT KEENER, 2-5-03

Page 66

36:12,13
offer 41:7 45:21
office 9:5 19:8,9 21:9
   28:19
offices 1:13
official 21:17
often 15:15
oftentimes 15:14
Oh 23:8 25:14 32:13
   50:14 52:12 57:19
okay 6:14,19 7:2,12 8:5
   12:7 13:12 14:15,21
   16:5 17:19 18:4 20:15
   20:20 22:1 25:6 31:1
   32:11,13 33:1,12 34:5
   34:10,10 35:6,13 36:2
   36:5,19 37:5,14 38:3
   39:4 41:18 42:11 43:7
   43:10,19 44:2,14
   45:11,16 46:11,14
   47:20 48:2 49:6,18
   50:2,9 51:5 53:8,16
   53:19 54:9 56:2,9,17
   57:2,2,11,19 58:1,9
   59:8 61:1
once 6:2 21:20
one 11:20 19:7,12,14,15
   20:6 23:16 24:1,7
   25:10 29:16 32:9,10
   40:15 45:2,8,10,12
   47:13 48:12 49:16,16
   49:18,18 51:2,11 52:5
   52:9 53:16,20 55:15
   57:9,12,16 60:2,20
ones 25:15,17 32:18
   33:9 37:3 42:16
only 7:14 24:9 25:11
   39:1 41:6 49:9 55:15
   60:4,5
opposite 48:6
order 15:3
organization 12:17
   16:1 56:1
original 24:5 32:2
originals 32:18
other 7:7 8:2,3 9:11
   14:7 15:21 22:5 24:7
   24:8 25:1,19,21 26:16
   32:16 33:5,14 34:16
   45:2,2 49:16,17,18
   52:11,12
others 25:14
out 8:17,18 15:2 17:3
   17:20 18:14,19 23:18
   27:19 29:1 30:10 31:6
   31:8,11 33:16,21 35:4

38:7 40:8 44:2,12
   46:17 54:4,7 56:18,19
   57:20 58:4 60:20,20
   62:6
outcome 62:17
out/tag 58:4
over 12:17 18:7 59:17
overlook 15:17
override 7:7
oversee 12:21
own 29:4 30:16 40:13
owner 14:6,9
owners 14:7

────────────
P
page 3:1 4:1 53:7
paid 26:20 27:1,3
paper 9:4
Pardon 36:10
part 14:16 22:19 25:7
   35:20 37:18 53:5,17
   55:2 57:15 58:12
parted 22:15
parties 5:3 16:21 62:15
   62:16
Pause 12:3 28:4 38:4
   60:1
pay 26:21,21
paying 26:18
payment 26:12 27:6
pays 54:21
Pennsylvania 4:3 28:20
   55:13
performance 23:11
performed 9:12,14
perhaps 13:18
person 9:12 48:12 52:9
personal 40:14,17,21
personally 62:5
personnel 3:9 10:9,20
   11:1 38:6 43:2,6
phone 4:7 18:8,9,10,16
   19:5 20:9 24:1,8,15
   25:2 40:2,10,18,21
   59:6
phones 40:3,7,14
Photocopy 31:10 4:5
photographs 3:10,15
   27:8,9 31:21 34:1,3
   35:17,17 37:9,11
photos 32:16
physical 54:16,18 56:2
Physician 1:11
pictures 36:1,15 42:15
pile 37:6 38:2 43:18
   57:20,21

place 28:9,10 62:5
Plaintiffs 1:4 2:2
Plan 47:14
please 6:15 7:4 9:1
point 15:19 18:19 21:12
   37:20 51:15
points 50:7,10
policy 4:7 21:14,17,19
   26:12 40:2,16 59:6,6
position 13:2,6,13 14:1
   22:9 42:8
positions 14:4 16:1
post 30:2,7,7
potential 53:11
preliminary 12:4
premarked 5:10
presence 62:14
present 18:6
presented 8:13
president 12:12,15,16
   13:8,16
pretrip 29:3,5 30:1,7
previous 3:20 25:3
   46:19 47:14 49:10
previously 7:10 11:6
prior 10:6 13:18 14:17
   20:14 23:1 44:6 46:17
   49:10,12,14 50:3 52:1
   52:5
private 13:20
Privately 13:21
privileged 18:2
probably 8:5 19:4,5
   28:12 31:18
problem 6:21 42:13
proceedings 12:3 28:4
   38:4 60:1
process 43:1,9 54:4
produced 18:16
product 16:21 49:19,20
provide 40:10
provided 9:8,15 25:17
   27:5 31:20 32:19,21
   59:11
provides 47:6
public 1:16 13:20 62:2
   62:20
purchase 47:11
purple 35:18
purpose 17:14,16,19
   39:21 42:10
purposes 16:20
Pursuant 1:11
put 19:14 37:5 38:2
   43:18 57:20
P.A 1:14 2:3

────────────
Q
qualification 47:7
qualifications 39:12
qualified 39:8 51:18
   52:4
qualifies 52:1
quarter 38:15,16,21
   39:3,4
quarters 39:3
question 7:4,5,6 9:1
   12:5 15:18 25:10 26:2
   26:3,6 34:2 41:3,12
   41:16
questionnaire 3:8 8:8
questions 6:14 61:3

────────────
R
R 1:3
raise 23:5,7,13
rate 23:18
Ray 14:6,9
read 36:10
reading 5:4 38:5 61:4
really 33:6,7
rear 31:5
reason 9:2 11:8,10
   41:20 57:11 58:14
recall 20:17
receive 38:9 46:21
received 26:13,20
recently 13:17 52:6
recognize 10:13
record 4:4 11:5 12:6
   24:2,8 28:3 29:12
   30:13 33:2,3 36:12,13
   50:15 52:1,5 60:19
recorded 62:9
records 7:14,15 24:15
   24:21 25:2,11,12,21
reference 53:9
referenced 53:6
references 52:8,9,16
referring 9:19 53:12
regarding 26:12 40:16
   46:17 47:18 59:12
regards 6:6
regular 30:18
related 62:16
relative 6:3 27:6
relying 31:1
remarks 53:9
remember 10:6 11:17
   21:1 50:11
repaired 34:17 35:3
   60:8
repairs 35:5

rephrase 6:15
report 3:11 15:3 16:11
   19:2 34:18,19,21 45:1
   55:5 56:3 57:4,8
Reported 1:21
represented 27:2
Request 3:20
requests 8:3
require 23:17 51:20
residential 15:14 40:5
resources 12:13,15,21
   13:8,14
respective 5:3
responses 46:21 49:9
responsible 26:17
restored 54:2
result 41:9 50:21
return 9:5
returns 31:3
reverse 9:3
Richmond 28:9,11
ride 56:21,21
right 8:6 13:4 19:10
   21:15 22:21 23:6
   31:10 33:11 39:6
   42:18 43:20 47:11,19
   51:12 54:3 56:12
   57:17 58:10 59:1 61:6
road 28:18 31:6,8,12
   48:5 56:18,19
roads 44:18
Roden 52:20
run 33:16
Ryder 35:2,4,4,7,12
   45:10,11 46:5 47:4,6
   47:12 53:18 60:4,8

────────────
S
safety 12:13,15,21
   13:10,11
same 5:5,8 24:12 28:12
   28:13 41:20 53:16
   55:20,21 56:1
saw 37:12 41:6
saying 51:21 52:3,3
   60:8
says 9:1 50:16,17 59:14
scene 18:11
Schlachman 1:14 2:3
screen 55:7,17
scuff 31:10,14,15
seal 62:18
seat 26:16
second 15:17 24:1 25:7
secondly 38:16
Security 4:6 56:14

CARROLL, et al. v. MARTIN, et al.    Case 1:02-cv-02084-MJG    Document 23-4    Filed 04/28/2003    Page 23 of 24    BRENT KEENER, 2-5-03

Page 67

seal 62:18
seat 26:16
second 15:17 24:1 25:7
secondly 38:16
Security 4:6 56:14
see 10:10,14 11:18
    15:21 17:13 18:1 25:6
    29:20 30:19 32:17,17
    33:9 43:12 45:5,9,14
    46:14 47:2,16 55:6
    56:9
seen 7:20 35:9 37:11
    50:13
self-employed 49:17
send 33:18,20
sent 20:19 46:19
separate 9:4
separated 9:3,7
September 50:18 51:17
service 3:17 35:4
set 62:6
setting 6:13
Sharon 1:16,21 62:2,20
sheet 9:4
shook 22:14
shooken 20:18
show 7:9 14:15 27:8
    33:5,9,10 34:1,14
    37:9 45:1,4 53:14
    58:2
showed 34:15 42:15
shows 60:10
side 9:4 33:5,11
sign 8:20 29:5
signed 9:8
significance 47:5
signing 5:4 61:4
since 13:15
six 35:17
Sleep 49:19,20
Social 4:6 56:14
some 15:2,18 33:5,9
    34:16 38:5 40:13
    42:21
somebody 27:13 33:16
    33:21 48:19
someone 29:20
something 26:15 40:7
    44:17 45:21 46:4
Sometimes 7:6
soon 33:20
sorry 19:7 24:4 27:21
    39:10 46:7 53:3
sort 47:9
South 1:14 2:4
speaking 17:15,16

specific 46:17
speed 50:19
speeder 48:9
speeding 26:16 52:6
speeds 48:19
spoke 17:10 54:14
stapler 24:17
start 8:5
started 23:18
state 12:5 51:19,21 52:4
    62:1,3
stated 41:21 56:6
statement 9:6,15,17,18
    9:20 47:17
STATES 1:1
stenographic 62:10
stenographically 62:9
step 15:7,7 43:8,8 54:5
still 18:1 27:18 42:7
stipulated 5:2,6
stipulations 5:1 62:12
stopping 6:21
stores 40:5
Street 1:15 2:4
subjective 48:12,20
submissions 8:3
subsequently 16:3
suit 22:11
Suite 2:8
superior 23:12
supervisor 21:9 23:14
    27:15,16 30:6,15,16
    30:19 34:13 60:7,13
supplied 7:19 8:2 29:8
    50:12 59:5
supposed 30:1,6,8
sure 5:16,17 12:1 19:3
    22:4,6 32:4 43:13
    45:13 47:3 52:15
    53:19 56:8 59:12,13
    60:15
suspended 22:17
suspension 50:21 51:3
    54:1
sworn 5:12 62:6

_____ T _____

take 3:7 6:17 7:3,5 15:2
    15:7 23:4 35:4 42:19
    43:5,8 54:5 57:20
    58:20 59:2
taken 1:12 5:20 6:8
    11:1 15:8 34:3,6
    37:15
talk 7:6
talked 17:7 18:7 41:11

44:13 46:8 51:16 52:5
talking 18:20 35:12
    47:13
tanker 44:17
telephone 2:5,9 7:15
    18:19 24:21 25:11,21
tell 5:13 6:15 16:13
    30:4 34:9 36:14,20
    41:18 43:1 50:4,16
    53:15,21
ten 19:1,6
tendered 45:7 56:11
Tenth 1:15 2:4
term 48:14
terminate 15:9 22:12
terminated 16:4 17:20
    21:20,21
termination 8:11 10:3
    11:3,9 21:3,6,16
terms 48:20
test 56:18,19 57:14,16
    58:3,6,7,11,15,19,21
    59:2
testified 5:14 42:9
testimony 7:18 8:1
their 7:5 29:4 35:20
    40:7,13,17
thing 11:20 24:12 57:1
    60:2
things 26:5,17 37:8
think 6:18 14:16 18:15
    20:18 24:3,13 29:10
    32:14 35:9,10,20,21
    39:1 40:15 44:17
    48:12,18,19 50:12
    52:14 53:6 58:16
third 53:7
thought 22:11 28:5
    42:20
thousand 59:15
three 4:4 11:12,15,21
    14:7 23:19 38:15
through 5:10 23:4 35:2
    54:3 59:20
ticket 26:20 27:3,6
tickets 26:12
time 13:7 21:2 27:3
    37:12 50:3 62:5
title 14:13
today 7:15 18:16
told 14:18 22:6,8
top 34:5
townships 15:14
Towson 2:9
traffic 26:12
transcribed 62:10

Transportation 4:3
tree 15:12,12
trees 15:15
trim 15:15
trip 30:2,4,7,7
truck 28:15,15,16,17
    29:1,19 30:20 32:20
    33:5,11 35:1,11,12
    44:17 46:5 60:20
trucking 47:21 48:14
trucks 15:13,20 23:17
true 62:11
truth 5:13,13,14
truthful 31:2
try 60:18
trying 21:1
two 11:10,11,14 12:16
    13:2 15:11 16:21
    18:19 19:14 22:7
    24:12 35:16 40:15
    48:2 49:9 52:8,16
type 6:5 13:19 26:17
    35:18 57:1
typewritten 62:11

_____ U _____

uh-huh 7:17 19:20
    26:10 40:12 44:8
    46:15 47:15 48:1,4,7
    52:13 54:15
underneath 25:13
understand 6:15 7:13
    26:19 59:13
understanding 38:5
understood 22:14
unemployment 8:10,14
    8:16
United 1:1 49:19,20
unless 32:14 33:6
unofficial 21:19
until 7:4 17:3
upset 22:13
USA 47:14
use 40:4,7
used 8:10 10:21
using 18:10

_____ V _____

v 1:5
valid 23:16 51:16,18
vehicle 27:9,10,14 30:2
    30:4 31:3,5,11,21
    34:12,20 35:3 50:15
    60:3,4,9
vehicular 11:11
verbal 52:16

Verizon 3:12,13,14
very 6:18
vice 12:12,14,16 13:8
    13:16
violation 50:17 51:2
    52:7
violations 26:16 50:8
    50:10
Virginia 27:19 28:9,11
visual 30:19 60:6

_____ W _____

wait 7:4 11:17
waiting 33:21
waive 61:4
waived 5:5,8 59:4
want 6:17 15:20 24:5
    37:5 52:15 59:13
warehouse 60:13
Washington 2:8
wasn't 6:12 17:3 22:13
    22:13 39:2 46:5 49:20
watches 57:1
way 7:3 27:21 37:6
    62:17
ways 22:15
Wednesday 1:12
Weiner 1:14 2:3
well 5:16 9:12,18 11:17
    12:2 13:1,11 14:7
    15:16 16:5 23:14 27:9
    30:3,10 32:16 40:5
    43:10 44:12
Wenger 8:19
went 50:2 52:17,18
were 7:15 11:20 13:10
    15:16,21 22:11,16
    23:1,1 25:17 34:3
    37:9,15 38:17 40:6
    44:18 49:12,14 50:10
    50:12 52:17,19 53:1
    54:3 62:13
weren't 16:2
wet 44:18 48:5
we'll 15:3 18:4 24:17
    28:6 29:17 43:18
    56:13 60:18
we're 6:16,18 20:7
    33:13,21 47:13 50:1
we've 8:1 35:9
while 10:17 26:13 33:13
    33:21 36:10
whole 5:13
WILLIAM 1:3
willing 15:17
Wireless 3:12,13,14

CARROLL, et al., v. MARTIN, et al.        BRENT KEENER, 2-5-03

Case 1:02-cv-02084-MJG   Document 23-4   Filed 04/28/2003   Page 24 of 24

Page 68

willing 15:17
Wireless 3:12,13,14
witness 3:2 5:5 12:2
   25:8 28:7 62:18
words 6:21 26:16
work 16:21 18:13
workers 6:6
working 27:18
works 27:19 43:9 58:1
worried 25:15
wouldn't 31:18 34:7
   39:8,15 40:19
writing 33:7
written 9:15 16:11
   29:12,15 53:1 54:10
   57:14,15 58:3,6,7,11
   58:18,20 59:2 60:10
wrote 9:21

**Y**

yeah 5:21 8:9 12:2,12
   12:20 14:21 15:10
   18:21 19:13 24:15
   28:7 29:4 31:7,9
   53:13 55:4 57:3 59:19
   60:18
year 4:4 23:6 38:16
years 12:17,18 13:3,15

**0**

01 34:6

**1**

1 3:7 5:10 7:10
1-26 34:6
10 3:16 36:8,9
10:02 1:13
11 3:18 43:21 44:1,3
11th 54:2
11-30-00 15:4
11:04 61:7
12 3:19 45:16,17,18
   53:20
13 3:20 20:1 49:8
14 4:3 20:1 51:7,9
15 3:11 4:5 56:16
16 4:7 59:10
16th 19:1
17th 62:18
19th 21:5 51:4
1998 22:16

**2**

2 3:8 8:7 37:10
2nd 39:2
20 1:14 2:4 3:12 37:13

2000 44:21 51:18
2001 4:4
2003 1:13 62:18
21201 1:16 2:4
21204 2:9
2289 20:5
24 3:13
2466 20:4
25 4:4 23:6
250 38:19
26 3:14

**3**

3 3:9 11:6
3rd 50:18
35 3:15
355-224 20:2
36 3:16

**4**

4 3:10 5:10
409 2:8
410-296-6826 2:9
410-685-2022 2:5
410-783-4771 2:5
410-825-1805 2:10
44 3:18
45 3:19
49 3:20

**5**

5 3:5,7,8,9,10,11 9:1
   15:5,6 24:1
5th 1:12
51 4:3
5150 27:21
56 4:5
59 4:7

**6**

6 3:12 20:8,12,13 24:3,4
600 2:8

**7**

7 3:13 19:1 24:12,17,18
   24:20,21 25:15
717 19:19
717-917-2466 3:13
738-3044 19:17

**8**

8 3:14 25:21,21 26:4
89 20:2

**9**

9 3:15 19:6 35:14,15,16

917 20:4
917-2466 20:2
97 50:3
98 50:18 52:7
99 54:2